Filed 2/28/22  P. v. Barker CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>MATTHEW BARKER,<br><br>        Defendant and Appellant. | A161741<br><br>(Mendocino County Super. Ct.<br> No. SCUKCRCR1931780) |

Defendant Matthew Barker appeals from a judgment convicting him of attempted manslaughter (Pen. Code, §§ 192/664)[1] (count 1) and making criminal threats (§ 422) (count 2) on the basis of a plea agreement, as authorized by a certificate of probable cause.  (§§ 1237, subd. (b), & 1237.5, subd. (b).)

Court-appointed counsel has filed a brief raising no legal issues and requesting this court to conduct an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436.  Counsel represents that he advised Barker of his right to file a supplemental brief within 30 days and

---

[1] All subsequent statutory references are also to the Penal Code.

1

to request that the court relieve his present counsel, but Barker has filed no such brief nor made such a request.

## FACTS[2] AND PROCEEDINGS BELOW

On June 26, 2019, at 3:00 a.m., Barker, then 53 years old with no prior criminal record, returned to his home in Ukiah from a work trip to Alaska and found his best friend in bed with his wife. He grabbed an aluminum baseball bat and struck the friend repeatedly, eventually cracking his skull. Officers dispatched to the scene observed blood droplets on the floor of the living room and hallway and saw that the victim, who was sitting on the edge of a bed, had a laceration on the left side of his head that was dripping blood and a contusion on his left forearm. Medical personnel who arrived transported him to the Ukiah Valley Medical Center.

Barker's wife stated that she was sleeping in bed with the victim when awakened by the sound of glass breaking. She then heard the victim yelling and the sound of him being hit with an aluminum bat. She also saw Barker repeatedly slam the door with the victim's face and head while "yelling, 'I'm going to finish you off motherfucker. I'm gonna kill you.'"

The wife grabbed the bat in order to hit Barker if he did not stop smashing the door into the victim. Barker's daughter called the police, then she and Barker left in her car. After Officer Oswald stopped the vehicle, Barker exited the passenger seat with his hands in the air. The officer noticed a bloodstained tablecloth wrapped around Barker's left hand and

---

[2] No preliminary hearing was held in this case and the clerk of the Mendocino County Superior Court has declared that no police report was filed or lodged with the court. Accordingly, the facts we rely upon are those described in the pre-sentence investigation report and recommendation of the probation officer, which includes a synopsis of a report of the Ukiah police.

wrist, and saw he was in pain. Barker said his daughter had picked him up at the Sacramento International Airport and driven him to his home in Ukiah. When he entered the bedroom, he saw his wife and another man lying naked in their bed. Barker told Oswald he knew the victim, who woke up and started attacking him. Barker also said the victim pushed him into a window, causing it to break and cut his left wrist. Barker's wife then grabbed a baseball bat "and began hitting him all over his body, including the back of his head." However, Officer Oswald only observed injuries to Barker's hand.

When confronted by the fact that the door was broken from the outside of the house to gain entry, not from the inside, Barker "nodded his head in agreement," but continued to say he was the one who was attacked. He also told the officer his wife attacked him with a bat "because she did not know who it was upon entry, due to the lights being off." When informed evidence indicated he had beaten the man he found in the house, Barker "denied the allegation and his statements continued to be inconsistent."

Detective Madrigal was told by the victim that he was an "invited guest" of Laura's and had been in her house for the past several days. He reiterated his previous statement to another officer that during the assault, Barker said he was going to kill him and he feared for his life and believed Barker "intended on killing him," since he had repeatedly beaten him with an aluminum bat. The victim later informed Detective Madrigal that he had "completely lost hearing in his left ear and his left eye was out of alignment, due to the brain swelling that had occurred as a result of the assault."

The complaint filed on June 27, 2019, alleged in count 1 that in the attempted voluntary manslaughter, Barker "did willfully, unlawfully, and without malice aforethought attempt to murder [his victim] upon a sudden quarrel and heat of passion." With regard to count 2, the making of a

3

criminal threat, the complaint stated that Barker did "willfully threaten to commit a crime which will result in death or great bodily injury to another . . . with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out" which is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution."

The complaint also alleged that in the commission of voluntary manslaughter, Barker used a deadly weapon (the bat), the use of which was not an element of the offense, and inflicted great bodily injury upon his victim. (§§ 12022, subd. (b)(1), 12022.7, subd. (a).)

As the issue in this case relates to Barker's effort to withdraw his plea, we describe the manner in which he entered the plea in detail.

Barker was arraigned on June 28. 2019. His attorney, Mark Kalina, stated that he had received the complaint and waived the formal reading of it, stipulated to "due and proper rights," said he had received [the] initial discovery package from the prosecution," and Barker did not object to requested stay-away orders relating to the person of his wife and to the victim, but objected to a stay-away order for Barker and his wife's residence. The court granted the requested orders and set bail in the amount of $170,000. The preliminary hearing was set for July 15, 2019. Kalina sought a continuance on the ground he had not received complete discovery from the prosecution and was willing to waive time. On July 9, the court granted a continuance to July 17, and Barker waived his right to have that hearing within 10 days of arraignment. The court relieved Barker from the duty to appear at the new hearing date because all that would then occur was the selection of new preliminary hearing dates, with no evidence to be presented.

4

On July 17, the court set a preliminary hearing for August 28, and a "pre-preliminary hearing" for August 8. Barker waived the requisite time. At a hearing on August 15, Kalina told the court that the parties had stipulated to ask the court "to bring the matter back on the 20th, next week, for further proceedings." The parties asked the court to hear the matter on August 20, "with respect to a stay-away order" and to vacate the preliminary hearing set for August 28, but "bring it back on that date for disposition or setting," which "will require a 60-day time waiver" from Barker. The district attorney said the reason for vacating the preliminary hearing was "additional discovery" and "negotiations," and explained that two dates were necessary because Barker was residing outside the county and modification of the protective order on August 20 would allow him to return and have an opportunity to "meet and confer with his counsel and hopefully resolve it on the 28th." The court then set the requested hearing dates.

On August 20, the court modified a previous protective order by allowing the peaceful contact between Barker and his wife. On August 28, counsel asked the court "to set a pre-preliminary hearing for September 12th, with preliminary hearing on October first." The district attorney told the court that the parties had begun "preliminary negotiations."

At the hearing on September 12, Barker entered a plea of no contest to attempted voluntary manslaughter, admitted the first and second special allegations that he used a dangerous weapon, a bat, and personally inflicted great bodily injury, in exchange for a stipulated prison sentence of seven years, and dismissal of count 2. The court noted that "the seven-year sentence would be suspended . . . for a period of 36 months with the amount of additional jail time . . . to be imposed to be submitted to the court at the

5

time of sentencing with sentencing being set out until December 12th of this year."

After the court admonished Barker about the rights he was giving up by entering a plea, and Barker stated that he had discussed this issue with his attorney, Barker waived those rights orally and also by executing a written waiver. When the court asked, "other than what I've stated on the record about the proposed disposition, have any other promises been made to you to get you to enter your plea here today," Barker answered "no." The district attorney then described to the court the factual basis for the plea. Asked his plea to the charge, Barker responded "no contest."

The court accepted the plea after finding Barker made a "knowing and intelligent waiver of his rights with an understanding of the charge, special allegations, possible sentences, and maximum consequences. The court found a factual basis for the plea, found Barker guilty of count 1 and the first and second allegations, and granted the People's motion to dismiss count 2.

The court then directed Barker to meet with probation and set the sentencing hearing for December 12, 2019.

The probation officer recommended 180 days in county jail, pointing out that Barker committed his offense, which appeared to be an isolated incident, while he was under emotional distress; he had no prior criminal record, would likely respond favorably to the mental health treatment he was already receiving, and was remorseful; and approximately 52 individuals who knew him had written letters describing him as "a thoughtful man, hard-working, nonviolent, and a law abiding man." The probation officer also noted that Barker would suffer numerous other adverse consequences, "such as firearm prohibition and potentially losing his business of 30 years, as he

6

has been an avid hunter for many years and could lose his primary source of income."

The probation officer recommended restitution to the victim in an amount to be determined, restitution to the Victim Compensation Board in the amount of $3,356.05, a restitution fine in the amount of $2,100, and a variety of lesser fees and fines.

At the commencement of the December 12, 2019, sentencing hearing, defense counsel Kalina asked for a continuance to January 13, 2020, which the People did not oppose. The basis for the motion was Barker's "inability" to comply with section 29810, which relates to the relinquishment of firearms. Barker's wife had tried to turn the seven firearms kept in their house over to the Ukiah Police Department, but was told that if she did so the guns would be destroyed. The court stated its belief that Barker could comply with the statute by releasing his interest in the firearms to his wife, and the district attorney stated he would look into that solution. The matter was continued to January 13, 2020.

At the January 13 hearing, the court noted there was a motion to continue sentencing and "at least a consideration of a motion to withdraw the felony plea." The court appointed Andrew Martinez, who sought to substitute in as attorney for Barker, relieved Kalina, and continued the matter to February 4.

Martinez appeared at the February 4 hearing and the court accepted his oral motion to continue the judgment and sentencing based on the representation that he would forthwith file a formal motion to withdraw Barker's plea. The matter was continued to March 5, 2020. Martinez told the court that if the motion to withdraw the plea was denied on that date "we'll proceed to sentencing."

At the March 5 hearing, the matter was continued to March 25, apparently because Judge Faulder was unavailable, and on March 25, it was continued again, this time to June 4, 2020.

At the June 4 hearing, Judge Faulder began by stating that he had reviewed the motion to withdraw Barker's plea filed on February 14, 2020, and supporting declarations of Barker and Martinez, the opposition filed on March 2 and attached declaration of former counsel Kalina, the transcript of the plea, and the plea form.

In his declaration, Martinez stated that Kalina provided Barker ineffective assistance in that he did not consult a blood spatter expert, did not obtain evidence regarding the victim's propensity for violence, did not investigate the truth of witness statements made to the defense, lacked a basis upon which to advise his client to waive the right to a preliminary hearing, and failed "to abide by [Barker's] decision to reject the offer by the district attorney."

In his motion papers, Barker stated that when he asked Kalina to follow through with the investigations he requested, "Kalina threatened to resign from the case" and Barker "felt he was forced to allow his attorney to proceed as he chose . . . and ultimately, which plea should be entered on his behalf." Barker's papers further stated that Kalina told Barker he " 'could spend the rest of his life in prison' " if he did not accept the plea offer, which was impossible for an attempted manslaughter charge. In his declaration, in addition to describing the investigations Kalina refused to undertake and Kalina's threats to "quit the case," Barker stated that when Kalina explained the details of the proposed plea agreement on the day of the court hearing, Barker became upset and Kalina told him to " 'buck up' and accept this deal, or face the possibility of spending the rest of my life in prison." When Barker

told Kalina he was "not stable enough to fully understand everything" he was being told, Kalina told him if he said this to the court, he "would end up in a mental hospital and the plea deal would no longer be available."

The court also considered Kalina's declaration, which was attached to the People's opposition to Barker's motion. Kalina declared that he consulted with Barker for approximately 13 hours, informed him of the elements of the charged offenses and the special allegations, and his potential defenses, as well as the consequences of a felony plea, which would constitute a strike. On August 30, Barker said he would accept the offer and resolve the case. On September 3, he said he wanted a second opinion from another lawyer. After he obtained one, Barker told Kalina that the other attorney had advised him to accept the plea offer.

Kalina declared that he reviewed all the discovery provided by the prosecution and went over it with Barker, and also considered the evidence and information Barker provided him. He specifically advised Barker that the prosecution could request that he be held to answer on an attempted murder charge at a preliminary hearing. Barker told Kalina he understood the charges against him, his possible defenses, and the consequences of accepting the plea offer.

Kalina's declaration also stated that on August 28, 2019, he advised Barker that he would withdraw from representing him "after [Barker] insisted that I had previously advised him that he could pay the alleged victim money and make the case 'go away.' I insisted that the conduct [Barker] suggested represented a crime." Finally, Kalina stated that he "personally examined and photographed the interior of Barker's residence where the alleged crimes occurred." Based on his examination of the

9

premises, as well as contemporaneous statements made by Barker, "the defense elected not to engage an investigator and/or expert."

In its opposition to Barker's motion, the People emphasized that Barker did not waive his rights by mistake, ignorance, duress, fraud, or inadvertence that overcame his exercise of free judgment, but with full knowledge of his rights and the consequences of waiving those rights and the possible punishment. As the People saw it, Barker simply changed his mind, and this is far from the strong showing of clear and convincing evidence required for relief under section 1018. (*People v. Cruz* (1974) 12 Cal.3d 562, 566.)

At the June 4, 2020 hearing on the motion to withdraw, Martinez pointed out that Kalina failed to dispute Barker's claims that Kalina failed to investigate evidentiary matters Barker suggested and told him he faced a life sentence when he did not. Martinez maintained Kalina's failure to dispute these claims was, in effect, "an adoptive admission."

Noting that Martinez had represented Barker nearly as long as Kalina, the court expressed wonder that he failed to offer any new evidence. Martinez answered that the problem with the plea offer was not evidentiary, but related to the possible consequences in executing a suspended sentence. "[M]y client anticipated nothing but trouble if he got on probation, had seven years hanging over his head because there was a nasty divorce going on as a result of this and it was a substantial amount of money that disappeared from their joint accounts, et cetera. [¶] So my client . . . was basically worn down both emotionally and psychologically that he should take this deal." Martinez described the catalyst of Barker's decision to accept the plea as Kalina's false representation that if he did not accept it, he would otherwise go to prison for life, which was too great a risk for Barker to bear while under the stress he was then experiencing.

10

After hearing from counsel, the court explained at considerable length why it was unable to find clear and convincing duress, fraud or overreaching evidence that the defendant was not informed of the direct consequences of his felony plea, and was therefore compelled to deny Barker's motion.

First, the court recalled the length of time Barker took discussing the "plea deal" with counsel and the court on August 12, which started at 9:00 a.m. and went on into the afternoon. What Barker was most concerned about, the court recalled, "was his ability to continue as a guide in Alaska, his ability to remain as a licensed contractor for his tree business, and whether or not he could continue to hunt with a bow and arrow if he were to accept this plea." "He admit[ted] in that declaration that he would not be allowed to be a gunsmith or possess firearms and then that he was advised that he would not be able to keep his contracting license," which were the reasons he initially turned down the plea.

Furthermore, the court indicated, Barker could not really have believed Kalina's threat that he would go to prison for life if he rejected the plea offer, because Barker had been told, and said that he understood, that "the maximum sentence was seven years, but not state prison, given the suspension and grant of probation, not a life term; knew it would be a strike for future sentencing purposes." The court observed that Barker's questions and careful reading of the felony plea form made him aware of the many rights he forfeited. The court recalled its appreciation of how "thoroughly" Barker reviewed the *Tahl*[3] waiver form with his attorney and even with his sister, and made clear his understanding of what he was doing and "the maximum consequences."

_____

[3] *In re Tahl* (1969) 1 Cal.3d 122.

11

When it became clear Barker's motion was about to be denied, Martinez told the court it had failed to address Kalina's admonition that Barker might spend the rest of life in prison if he did not take this deal." The court disagreed. Noting not only the likelihood Barker knew a life term would not result from the charged homicide—because the court had told him so, and Barker stated that he understood—the court also pointed out that Kalina's warning was justified, because Barker had been arrested for attempted *murder*, and if he withdrew his plea, he could still be held to answer for that life offense at the preliminary hearing, which had not yet been conducted.

After denying Barker's motion to withdraw his plea, the court set June 25, 2020, for judgment and sentencing and stated that it was its "intention to follow the agreed-upon disposition." Upon the stipulation of the parties on June 25, the matter was continued to July 23. For reasons not clear from the record, the sentencing hearing apparently did not take place on July 23. The next reported hearing took place on September 16, 2020. However, at that hearing, counsel for the parties stipulated to continue the matter to October 27, and the court made the requested order. But the judgment and sentencing did not take place in October, as the parties sought and were granted another continuance to November 4th. On that date, the court finally entered the judgment and sentence earlier agreed upon by the parties.

Subsequently, the court and counsel discussed modifications to the conditions of probation earlier indicated. The only proposed modification that bears mention in this opinion is Barker's apparent, and very unusual, request to alter his admission of the factual basis for his plea.

In a supplemental statement in mitigation, Martinez complained about language in the probation officer's report that Barker "is attempting to deny

12

or not accept responsibility for something he already admitted in court" and argued, "[t]his puts my client in a position that it looks like he's backing out or not wanting to . . . accept responsibility from this horrific crime." Martinez maintained that the facts outlined in his supplemental statement showed that "A, he did not use a bat and B, it was Mrs. Barker who used the bat on both her paramour at the time and her husband." Martinez's supplemental statement also contained photographs showing "that my client was injured in this altercation by somebody other than [the victim] And [the victim] was also injured by somebody. This information was provided to defense counsel at the beginning of the case." Martinez argued that Kalina improperly refused Barker's request to show the probation department and the district attorney photographs of his injuries, which assertedly indicated he was a victim, not a perpetrator of the offense to which he plead no contest.

Claiming the perpetrator was not Barker but his wife, Martinez told the court, "There's a whole background of information that has been provided to the court, with the financial information, indicating that Mrs. Barker has a history of running into or running up debt, significant debt, and then leaving the relationship. That's exactly what occurred in this case for [Barker]. He gets to Alaska, finds out there's no money for him to pay for fuel or costs for the items that he's doing work in this lodge in Alaska."

Martinez asked the court to remove from the record the impact statement filed by Barker's wife as a victim, because "she's not a victim in this case." At that point, the court assured counsel it was not going to hold the arguments of past or present counsel for Barker, or the impact statement filed by his wife against him, and all that it was considering in determining Barker's sentence was the factual basis for his plea he expressly admitted.

13

Martinez then argued that in consideration of the doubts about Barker's culpability he claimed, the court should impose no jail time or allow Barker to serve any time imposed on electronic home monitoring.

As to the considerations Martinez raised regarding the offense, the court stated that "if it's something that I should consider in terms of a jail sentence, okay, I'll take it for what it's worth; but I'm not going to accept new facts to support the plea . . . . This isn't the appropriate place for that. I just want to make it clear to you, Mr. Martinez, I'm only considering the factual basis given by the prosecution and accepted by the defense as to the conduct that supports the charge in this case."

After describing in detail the many conditions of probation it imposed, most of which were standard, and the applicable fees and fines Barker was required to pay—all of which Barker explicitly accepted—the court addressed the term in county jail, which the court said it "struggled with."

The court summed up its reasoning and determination as follows: "You're now 53 years old and you have no prior criminal history and that's important to the court. You appear to have been gainfully employed and productive throughout your life until this event.

"I understand the emotions and circumstances that were involved. I understand that there . . . are two sides and you feel you did not get to fully explain your side to the story in entering this plea.

"My decision in imposing the jail sentence is based on the nature of the charges, including the injuries to the victim and the factual basis I accepted at the time of the plea.

"I do believe that placing you on probation will be appropriate and I believe you'll be successful on probation. But I also believe that a jail

14

sentence is appropriate. I am going to impose 180 days; however, I am going to authorize electronic home monitoring as an alternative to going to jail."

The court also imposed stay-away orders regarding the victim and his residence, which Barker accepted.

## DISCUSSION

The scope of reviewable issues on appeal after a plea of guilty or no contest is restricted to matters based on constitutional, jurisdictional, or other grounds going to the legality of the proceedings leading to the plea; guilt or innocence are not included. (*People v. DeVaughn* (1977) 18 Cal.3d 889, 895–896.)

Barker's change of plea complied with the requirements of *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl, supra,* 1 Cal.3d 122.

There was a factual basis for the plea. Barker was at all times represented by competent counsel who protected his rights and interests, and Barker failed to sustain his burden of proving otherwise.

The sentence imposed is authorized by law and within the scope of the court's discretion.

Our independent review having found no arguable issue that requires further briefing, the judgment, including the sentence, is affirmed.

_____
Kline, J.*

We concur:

_____
Richman, Acting P.J.

_____
Miller, J.

*People v. Barker* (A161741)

* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.